On the 31st day of August and the 2nd day of September, 1925, John A. Taylor purchaser the stock of goods and fixtures of the Buladeen Supply Company, a partnership composed of D.R. Grindstaff, S.R. Estepp, and Jake Shoun, located on Stony Creek, in Carter County, Tennessee, for the purchase price of $2578.52, evidenced by twenty-five $100 notes, and one note of $78.52, payable consecutively on the first of each month, and to secure the payment an attempt was made to retain the title in the seller under a conditional sales contract. But as additional security Taylor and wife executed a trust deed upon their home, securing the twenty-six notes. The purchaser went into possession and began to carry on a retail mercantile business.
On the 18th day of February, 1926, the purchaser, John A. Taylor, procured, or continued fire insurance covering the stock of goods and fixtures, by insuring his merchandise in the sum of $2000, and his fixtures in the sum of $150; this coverage was carried by two companies, each issuing a policy in the sum of $1075.
On the night of March 8, 1926, the store and all its contents were destroyed by fire. The insured filed proof of loss, and upon request filed an additional and supplemental proof of loss; thereafter he was called by the attorney representing the insurance companies and examined under oath in reference to his method of bookkeeping, for the purpose of determining if the iron safe clause of the policies had been violated. From this evidence the companies denied liability upon the policies, and expressed their intention to resist payment of the claims, for the reason the insured had not complied with the iron safe clause of the policies.
In the meantime the insured had assigned his claims under the policies to his creditors, the former partners of the Buladeen Supply Company, and the holders of the unpaid $100 purchase money note series. His general creditors learning of this had filed an involuntary petition in bankruptcy against him, and because of this the secured creditors, and the insured, agreed to set aside the assignment, *Page 540 
by making another assignment to Lee F. Miller, Attorney for the insured, as Trustee, to secure the claims of all creditors, named in the assignment, and in this manner and for this purpose "John A. Taylor hereby joins in assigning, selling, delivering and passing to the said Lee F. Miller, Trustee, all their rights, title, claims, interest and equity, of every kind and character, and without exception or reservation, in and to said policies and said insurance contracts, and any proceeds or avails to be derived therefrom, for the purpose and to the end that he, as representing all of the parties hereto, shall negotiate, institute and prosecute claims and demands, or suits, if necessary, against one and both of said insurance companies, for the purpose of collecting the proceeds and avails thereof by law; or, for the purpose of negotiating and consummating compromise or settlement with one or both of said companies, all to the end of securing in the quickest time and way, the maximum amount therefrom; and which trust the said Lee F. Miller hereby accepts without incurring any obligations, whatsoever, excepting to properly account for any funds coming into his hands by the proper pro rata distribution thereof, as hereinafter explained, after making deductions for fees and expenses in connection with the collection of same."
Then follows the manner of disposition of the proceeds realized on a pro rata basis, and then provides "said net avails thus ratably distributed, or to give the said Taylor proper credit therefor, and to be an extinguishment of the said Taylor's indebtedness to them to that extent only." Having thus secured the claims of all creditors, the petition in bankruptcy was dismissed.
The Trustee began negotiations with counsel representing the insurance companies for a settlement of the claim. The companies denied liability because of an alleged violation of the iron safe clause; and particularly this provision of the clause: "(2) That the insured shall keep a set of books showing a complete record of business transacted, including all purchases and sales both for cash and credit;" but the companies consented to negotiate.
These negotiations were carried on by correspondence; the companies offered to settle on the basis of forty per cent of the claims, and the Trustee and his legal associate then apprehensive of their ability to reduce the claims to judgment because of the failure of the insured to keep a book account of his cash sales, concluded it was advisable to accept the forty per cent offer. (The Trustee states further that he was not aware that the insured had any books in his safe upon which to base a claim of loss.) Having determined to accept the offer of settlement the Trustee communicated with the creditors named in the assignment and with the insured Taylor, for *Page 541 
the purpose of obtaining their assent to the settlement. The creditors assented and authorized the settlement, but the insured Taylor would not agree to the settlement. These facts were communicated by the Trustee to counsel representing the companies, with the offer on the part of the Trustee to make the settlement, notwithstanding the objection of the insured, if the companies would recognize his authority to act independently under his trust agreement. Counsel representing the insurance companies then communicated with the adjuster, who was representing and carrying on the compromise, and stated that the Trustee, Miller, was reliable, and in effect recommended the acceptance of the Trustee's offer to make the compromise independent of the insured. The adjuster writes counsel representing the companies referring to the reliability of the Trustee, and relying on the Trustee's representation of his power to act independently, accepted the proposition on behalf of the companies with the following provision, namely, that the creditors named in the assignment join with the Trustee in executing the release to the companies. The Trustee procured the signatures of the creditors and assigned and transmitted to counsel representing the companies the release, to be forwarded to the home offices of the companies, and checks representing the settlements were turned over to the Trustee, but before he cashed the checks he received a communication from the insured protesting against the settlements, and threatening to hold him personally liable for making the settlements over his objection and protest. The insured called upon the Trustee who then claimed to have first learned that the insured in fact had books in the safe at the time of the fire from which proof of loss could be made, and the Trustee immediately returned the checks with the statement that the compromised agreement was made under a misapprehension of facts.
This suit was then instituted in the name of the Trustee and the insured against the two insurance companies, to recover upon the two policies of insurance. The bill refers to the Trustee's compromised settlement, but alleges it was procured through fraud on the part of the defendant companies. By an amendment this charge of fraud was modified so as to exonerate counsel representing the insurance companies. The bill prays for general relief.
The defendants answered the bill setting up the compromised settlement and relied upon its binding force. The allegations of fraud were denied. But as an alternative the companies defended upon the ground of the violation of the iron safe clause by the insured. The answer was then filed as a cross-bill seeking relief upon the compromised agreement, and asking for a penalty of twenty-five per cent against the insured because of his failure to carry out *Page 542 
the agreement. The cross-bill was answered and "it is denied that the minds of all of the parties ever met on the subject of the alleged compromised settlement. . . . It is denied that any final settlement was reached by and between all the parties, or that any fair settlement was ever sought to be reached by the defendants. The cross-defendants deny that the defendants are acting or have acted in good faith in this matter. . . . It is also denied that the defendants have tendered to the complainants any sums whatever in such way and manner as to amount to a legal tender."
The Chancellor first disposed of the issues raised under the cross-bill, and held that the Trustee's powers were analogous to the powers of an agent, and so he had no authority to act over the protest of one of his principals and bind the principal. That the insured had such an interest in the trust agreement as authorized him to veto the action of the Trustee, in compromising a claim for a sum which he thought was inadequate. The Chancellor dismissed the cross-bill; and upon this holding the companies have assigned error.
We think the holding of the Chancellor was correct; to approve the action of the Trustee participated in by the creditors and the insurance companies over the protest of the insured is to approve a constructive fraud. The secured creditors represent a claim of more than $2000, protected by a trust deed upon the home of the insured, while the general creditors are represented by claims of less than $300. If these creditors can force a settlement of the claim against the insurance companies for $800, or forty per cent of the face of the claim, they may be enabled to collect their debt in full, out of the property of the insured, and leave him denuded of all assets. If the insured can prevent this settlement, and collect the face of the policy, he will find himself free of debt with the exception of less than $400, and his home free of encumbrance. At the date of the execution of this trust agreement the insured was not relieved of one dollar of primary liabilities. The sum realized under agreement was to be applied only in partial discharge of the liabilities. The Trustee acts for the best interest of all the beneficiaries, and when the Court sees he acts to the prejudice of one, his action will be restrained. Under the circumstances of this case the insured had a voice in this settlement, and so long as he is acting in good faith, and for the protection of his interests his right to act will be recognized.
The primary purpose of this trust agreement was to sequestrate the funds in the interest of the creditors, and not to denude the insured of his rights in the settlement. At first this purpose was recognized by all parties; the Trustee consulted with the creditors and the insured, and the insurance companies prepared a release *Page 543 
to be executed by the insured. Later the companies agreed to accept a release signed by the creditors and the Trustee, then why was it necessary for the creditors to sign the release if the companies recognized the rights of the Trustee to bind all the parties? And even then the companies made the settlements upon the reliability and representation of the Trustee. The companies had full knowledge of the facts, and under the circumstances as is detailed, the companies had no right to rely upon the sole authority of the Trustee to act for the insured, they cannot coerce the insured by such a method. There was no binding compromised agreement consummated; the minds of the parties to be bound never met, and the pleadings were sufficient.
The Chancellor found as a fact that the iron safe clause had been substantially complied with. He also held that no question was made by the insurance companies as to the three-fourths value clause, and this holding is not questioned by an assignment of error. The court found that on the night of the fire the insured had within his safe three books which contained first the inventory made at the date of the purchase, August 31, 1925; second, the entry of invoices of goods purchased from the date of the sale to the date of the fire; third, and a list of the credit sales during this period. These books were exhibited in evidence. The Chancellor further found "said Taylor's cash sales, as shown by the deposition of E.H. Holly, Vice-President and Cashier of the First National Bank of Elizabethton, Tennessee, and as shown by the original ledger sheets of said First National Bank covering the amount of said Taylor, amounts to $2381.51," to which is to be added Taylor's board for six months and eight days at $17 per month, amounting to $104.40, represents the cash sales. By adding the inventory and invoices and subtracting the sum of the cash and credit sales, less twenty-five per cent gross profits, we obtain the value of the goods at the date of the fire. The Chancellor found this value to be $2958.20. The cash sales are only determinable by the bank's statement, and the companies insist it was incumbent upon the insured to keep a book account of his cash sales. The companies except to the introduction of the bank statement. The evidence shows, and the Chancellor found, that the insured regularly deposited the cash derived from the cash sales in bank, and the statement reflects the value of the stock reduced to cash. This, he held, to be a substantial compliance with the provision of the policies. The purpose of the iron safe clause is to provide a reliable method for the determination of the loss; it is not necessary to keep the books within the safe so long as they are preserved, for they may be kept in another house. If the merchant elects to keep a record of his cash *Page 544 
sales by his bank statement, and keeps it accurately, or at least not to the detriment of the insurance companies, then we can see no objection to the method. The method is as reliable as an entry at the end of the day of the cash sales in a book. The merchant is not required to keep the cost and sale price of each article sold, so the bank account will reflect the same facts as the books would reflect. An accountant was introduced, who had had experience in determining the value of the destroyed stock of goods, and he demonstrated the correctness of the Chancellor's figures. Counsel criticised the court in permitting the use of the bank's statement, in determining the amount of the cash sales. We will examine these criticisms to see if injury is done, or could be done, to the insurance companies.
It is said the merchant would exchange his goods for produce; but he would sell the produce for cash and deposit the proceeds, and if he made a double profit it rebounded to the interest of the insurance company by increasing his cash sales.
And sometimes he would take checks in as cash from his customers and refund to them the difference, but when he deposited the checks as cash, the difference rebounded to the interest of the insurance companies. Sometimes he wouldn't have the money to repay the difference to the customer, and he would take the checks to the bank, obtain the money and return and pay it to the customer. The same result followed.
Some of Taylor's customers issued orders on the store to their laborers, and Taylor would pay these orders in cash and charge to the customer's account. These items were not reflected in the bank account, but were reflected in the charge account, and the companies were in no way injured.
The next criticism is that the Chancellor allowed twenty-five per cent as gross profits, and the profits were not reflected by the bank account. Had the insured kept a book account of his cash sales his profits would not have been reflected by the books; a cash sale would not reflect the profits. To name the article would be of no advantage, for it may represent one of two invoices carrying different prices. The Chancellor sustained an exception to the evidence given by the insured in reference to his profits, but in his opinion he used this evidence in making his calculations and determining the value of the stock of goods destroyed. He therefore must have reversed himself upon the ruling of the evidence. But if we exclude the evidence and do not deduct the twenty-five per cent profits, still the value of the goods destroyed exceeds the amount of the recovery, since there is no issue made upon the three-fourths value clause. *Page 545 
We concur in the holding of the Chancellor that the bank's statements substantially reflect the cash sales, and the companies are benefited and not injured by the figures or totals representing the cash sales.
Exceptions were taken to the introduction of the inventory and invoice accounts on the ground that these papers have been altered since the fire, by identification marks, calculations and the addition of the omitted items. It is said an inspection of the instruments justified this conclusion, and they should have been excluded as evidence. If the instruments appear upon their face to have been altered, the presumption of law is that the alteration was made at the time of the execution of the instruments; but these papers are not contractual and contain no part of the terms of the contract, and an addition will not defeat the entire instrument by requiring its exclusion as evidence. There is no reason why the insured could not correct his invoice accounts by the insertion of an omitted invoice; this or any other invoice could be attacked as spurious, but the court is not justified in excluding the entire account because it appears that an omitted invoice has been inserted.
We concur in the findings of fact as found by the Chancellor, and are satisfied with the justness and soundness of his decree, which is affirmed with costs. The recovery against each of the companies is for the sum of $1028.75 with interest from February 28, 1927.
Snodgrass and Thompson, JJ., concur.